UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
PAMELA SAUNDERS,

                            Plaintiff                      **REPORT AND**
                                                  **RECOMMENDATION**
          -against-                       17-CV-1394 (JS) (ARL)

COUNTY OF NASSAU, et al.,

                          Defendants.
--------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

       The plaintiff, Pamela Saunders, commenced this action on March 13, 2017, against the defendants, the County of Nassau, the Nassau County Sheriff's Department, Roger Sokenis, Steven O'Malley and Ronald Rogers alleging violations of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL") and the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983. Before the Court, on referral from District Judge Seybert, is the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court respectfully recommends that the motion be granted.

## BACKGROUND

### A.     The Parties

       Pamela Saunders ("Saunders") is a resident of the defendant County of Nassau ("County").[1] Compl. ¶ 8. In 1995, Saunders was hired by the Nassau County Sheriff's Department ("Sheriff's Department") to serve as a corrections officer at the Nassau County Correctional Center ("NCCC"). Defs. Rule 56.1 Stmt. ¶ 1. Throughout her twenty plus years of service, Saunders has primarily been assigned to three units at the NCCC. *See* Estes Decl. Ex. 1;

---

[1] The following facts are drawn from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted.

66:4-66:15.  In 2005, Saunders was assigned to work in the Medical Unit.  *Id.*  In July 2014, Saunders requested to be transferred to the Security Unit because she wanted to use her experience to assist younger corrections officers.  Defs. Rule 56.1 Stmt. ¶ 81.  This request was initially denied.  Pl. Rule 56.1 Counter-Stmt. ¶ 81.  However, on June 25, 2015, she was transferred to the Security Unit following an incident, which will be discussed below.  Defs. Rule 56.1 Stmt. ¶ 61.  At some point, she was also assigned to the Prison Ward.  *See* Estes Decl. Ex. 1; 66:4-66:15.

The defendant Roger Sokenis ("Sokenis") worked for the Sheriff's Department at the NCCC for approximately 31 years.  Defs. Rule 56.1 Stmt. ¶ 4.  He was also assigned to the Medical Unit at the NCCC from 2011 until his retirement in December 2015.  *Id.*  During his tenure in the Medical Unit, Sokenis was one of Saunders' supervisors.  *Id.*  The defendant Steven O'Malley ("O'Malley") has worked at the NCCC for 29 years.  *Id.* ¶ 2.  O'Malley worked in the Medical Unit from 1998 until 2017, and held the positions of corporal, sergeant, and lieutenant. *Id.*  O'Malley also supervised Saunders from 2005 until 2017, except for one month in 2013.  *Id.* The defendant Ronald Rogers ("Rogers") worked at the NCCC from 1984 until his retirement in December 2015.  *Id.* ¶ 3.   From approximately 2005 until his retirement, he was a captain and oversaw various units including Medical, Security, Rehabilitation, Transportation, Commissary, Recreation and Gangs.  *Id.*  Saunders was in his chain of command.  *Id.*

### B.    Corrections Officer Assignments

Each day, a supervisor at the NCCC sets up the daily assignments for each of the corrections officers.  *Id.* ¶ 67.  The Sheriff's Department has discretion to assign the officers regardless of their seniority to any unit necessary to meet the needs of the NCCC.  *Id.* ¶ 68.  No officer may ever select his or her own assignment or post in the NCCC but they can indicate a

preference, which a supervisor will try to accommodate.  *Id*. ¶¶ 69, 76.  For example, while she was assigned to the Medical Unit, Saunders was primarily assigned, by request, to the mental health post.  Estes Decl. Ex. 1; 66:23-68:15.  Indeed, Saunders contends that she maintained that "steady" post until some white officers came to the Medical Unit after which she would sometimes be passed over for the mental health post.  *Id*.; Pl. Rule 56.1 Counter-Stmt. ¶ 76.  Despite this contention, Saunders admits there are no permanent posts and that any officer, regardless of seniority, may be assigned or reassigned a post, at any time, on any day, even in mid-shift, based on a unit's staffing needs.  *Id*. ¶ 71.  She also acknowledges that all posts involve the same demands of providing for the care, custody and control of inmates although some assignments do require less interaction with inmates.  *Id*. ¶ 75; Pl. Rule 56.1 Counter-Stmt. ¶ 75.

Moreover, a corrections officer's job assignment on a particular day has no bearing on the rate of pay earned by that officer.  *Id.* ¶ 77.  In addition, with respect to overtime, a corrections officer may work overtime in units to which they are not then assigned.  Defs. Rule 56.1 Stmt. ¶ 36.  Finally, with respect to "steady" posts that is a posting which could last for days, weeks, or months depending on need, Saunders admits that both black and white officers were occasionally given steady posts at the NCCC.  Defs. Rule 56.1 Stmt. ¶ 80.

### C.    The Events Leading up to Saunders' First Harassment and Discrimination Complaint

According to Saunders, sometime in late March or early April 2013, she learned from other officers at the NCCC that a corrections officer named John Lima ("Lima") made an objectionable comment to another corrections officer named McPartlin, specifically, "These black niggers are out of control." *See* Saunders Aff. ¶¶ 3, 4.[2]  Saunders contends that it was not

---

[2] The defendants take issue with the fact that Saunders has stated facts in her affidavit that were not included in the

the first time that Lima had referred to black inmates in that way.  *Id*. ¶ 8.  Indeed, Saunders

avers that several black inmates had complained about Lima calling them names and exhibiting

aggressive behavior toward them.  *Id*; Estes Decl. Ex. 1; 10:8-13:18; 300:23-302:6.

Saunders claims that, shortly after hearing the rumor about Lima she actually witnessed

an incident involving Lima and a young black inmate who needed to be seen by a mental health

worker.  Saunders Aff. ¶ 9.  Saunders states that Lima seemed angry and was yanking on the

inmate's handcuffs and shackles.  Estes Decl. Ex. 1, 10:8-11:22.  She states that Lima told the

inmate to move in a certain direction, but the inmate was moving slowly so he banged the

inmates' head against the concrete floor.  *Id.*  Saunders told Lima to stop and other corrections

officers intervened and removed the inmate.  *Id*.  Following this incident, Saunders visited the

Medical Unit and told a clinician what she had witnessed.  *Id.* at 12:3-6.  She also complained to

Sgt. Nicholas.  *Id.*  Saunders contends that after speaking with Sgt. Nicholas about Lima, the

officers in the Medical Unit told her that Corrections Officer Grange ("Grange"), who is not

named as a defendant in this lawsuit, was calling her an "inmate lover." Saunders Aff. ¶ 12;

Estes Decl. Ex. 1, 267:13-268:24.  In addition, Saunders claims that those same corrections

officers told her that Grange would not give her overtime in the Security Unit and that he

believed she had filed a discrimination lawsuit against Lima.  *Id.* ¶ 13; Estes Decl. Ex. 1, 267:13-

268:24.

Saunders further contends that she then complained to five other superior officers.  *Id.* ¶

15.  First, Saunders claims that she told Lt. Vera Fludd ("Fludd") about Lima's aggression

---

complaint or testified to at her deposition.  Defs. Reply at 1-3.  Although the defendants acknowledge that some of
these facts were "mentioned" in the deposition, they ask the Court to disregard any facts that are new or that
elaborate on her claims in an attempt to raise an issue of fact.  The Court will address this argument below.
However, to better understand the parties' contentions, the facts have been included as part of this background
statement.

towards black inmates. *Id.* Saunders says she advised Fludd that she was being called a "rat" and an "inmate lover," and was being denied overtime because she had complained about Lima's conduct. *Id.* Saunders then spoke to the defendant O'Malley and to Sgt. George Skaee ("Skaee"). *Id.* She also told O'Malley and Skaee that Grange was calling her a "rat" and an "inmate lover" and that he was preventing her from getting overtime in the Security Unit. *Id.* In addition, Saunders told them that Lima had a habit of beating up black inmates. *Id.* Saunders claims that she also complained to Lt. Benjetta Miller ("Miller"), who worked in Internal Affairs. *Id.* Saunders similarly told Miller that Lima had a habit of being aggressive towards black inmates. *Id.* Saunders repeated that she was being called a "rat" and an "inmate lover" for reporting him. *Id.* Finally, Saunders says she approached Sgt. Debbie Lewis ("Lewis"), who worked in Human Resources. *Id.* Once again, Saunders complained that Lima had a habit of being aggressive with black inmates. *Id.* In addition, because Lewis is a black woman, Saunders stated her belief that there were many racist officers at NCCC, including the defendant Sokenis, Corrections Officer Kevin Berry, Skaee, and others. *Id.* She also reported that Grange would not hire her for overtime and was calling her a "rat" and an "inmate lover" because she had complained about Lima's conduct.[3] *Id.*

According to Saunders, Lewis instructed her to document her complaints and stated that the white officers at the NCCC were part of the "good old boys club." *Id.* ¶ 16. However, neither Lewis nor any of her supervisors took steps to address her complaints. *Id.* Accordingly, Saunders decided to talk to Grange directly and ask him about his purported comments. *Id.* ¶ 17. Saunders claims that Grange admitted making the comments and told her that no one was going

---

[3] The defendants assert that Saunders never mentioned having complained to Fludd, Miller or Lewis in her complaint or her deposition. Defs. Reply Mem. at 2. Saunders counters that she was never asked to list all of the individuals to whom she complained at her deposition. Pl. Sur-reply at 3.

5

to hire her for overtime in the Security Unit because she was a "rat" and an "inmate lover." *Id.* ¶ 18.  In fact, Saunders claims that Grange told her that she was being "blackballed." *Id.*

### D.    Saunders' August 30, 2013 Memorandum

On August 30, 2013, Saunders submitted an inter-departmental memo to O'Malley, in which she stated, "I have been the target of harassment and discrimination in this department for many years now."  Defs. Rule 56.1 Stmt. ¶ 5.  Her August memo does not reference the complaints she made about Lima several months earlier or specify the type of discrimination. Instead, Saunders complains about a new incident.  Specifically, Saunders recounts that she had been assigned to the B2 - Lobby Mental Health Screening Room and Corrections Officer Cantore ("Cantore"), who was stationed in the lobby, mumbled statements behind his newspapers when she asked him to call up inmates for a doctor.  Estes Decl. Ex. 7.  When she asked Cantore if he had an issue with her, he shouted, "I don't like you!  But I don't have a problem working with you."  *Id.*  Other correction officers then joined the conversation and Saunders says she became fearful for her safety.  She turned to Corporal Hamilton for help but he did nothing.  *Id.*  Cantore then "barged in the office doorway" and shouted, "I don't like you Saunders because 18 years ago you insulted me in front of the Sergeants when I was new on the job!"  *Id.*  In the memo, Saunders also complained:

> I have been the target of harassment and discrimination in this department for many years now. My failure to take this matter further was due to retaliation. It appears that whenever I try to perform my duties the way I was trained and sworn in to do I am often confronted with combative behavior from my fellow officers. Rumors are been spread around not to talk to me. That I am a 'Rat' and I protect inmates against officers. A particular office[r] said 'Saunders is black listed thought out the department.' This malicious behavior is making me sick, as I am experiencing frequent headaches. Please look into this matter, as I [cannot] continue to be subjected to this violent behavior. This nonsense should not be tolerated in the work place. It's unproductive and unbecoming of an officer.

*Id.*

Pursuant to Sheriff's Department Regulations and Equal Employment Opportunity ("EEO") Policy, O'Malley forwarded Saunder's August memo to the Affirmative Action Unit. Defs. Rule 56.1 Stmt. ¶¶ 9-10.[4]  At the time, Andre Guilty ("Guilty") was an Affirmative Action Specialist assigned to the Bias Unit at the NCCC.  *Id.* ¶ 7.  Guilty's duties included taking complaints from protected classes of individuals, providing those individuals with a County's EEO Policy Booklet, explaining the policy to complainants, investigating complaints and forwarding complaints to Elisabeth Osterman ("Osterman"), the Director of EEO for the Nassau County Office of Human Resources.  *Id.* ¶¶ 7-8.  Upon receipt of the August memo from O'Malley, Guilty contacted Saunders and Saunders visited the Affirmative Action Unit.  *Id.* ¶ 11.[5]  During the meeting, Saunders told Guilty that she did not want to file [an EEO] complaint because she had no faith in the process and was getting a lawyer.  *Id.* ¶ 12; Pl. Rule 56.1 Counter-Stmt. ¶ 12.  Nonetheless, Saunders now complains that August complaint was never resolved.  Saunders Aff. ¶ 24.

### E.    The Memo to Corey Timo Concerning Overtime

Eighteen months later, Saunders sent a second memo to Corey Timo ("Timo"), the First Vice President of the Nassau County Sheriff's Correction Officers Benevolent Association. Defs. Rule 56.1 Stmt. ¶ 13.  At the time, Timo was on full release from the NCCC and was working only for the union.  *Id.*  Saunders wanted the union to look into the NCCC's alleged unequal distribution of overtime.  *Id.* ¶ 14.  It appears that Saunders drafted the memo to Timo

---

[4] Saunders contends that O'Malley should also have informed the Sheriff that she had filed a discrimination claim. Pl. Rule 56.1 Counter-Stmt. ¶ 10.

[5] The parties dispute whether Saunders had explained to Guilty why she had come to his office.  Pl. Rule 56.1 Counter-Stmt. ¶ 11.

after she had been assigned an overtime post on February 5, 2015, offering less overtime hours than she wanted - an incident that is discussed below.

To provide context for the Timo Memo and Saunders' claims concerning overtime pay, the defendants explain that when overtime is available in any particular unit, officers assigned to the unit where the overtime is available have priority to accept overtime before officers outside of that unit. *Id.* ¶ 32. When all the names on the list are exhausted and no officers in a particular unit desire overtime, officers from other units may be offered overtime. *Id.* ¶ 36. However, corrections officers wishing to work overtime in units to which they are not then assigned must sign up for overtime in those units by either physically signing a book, putting their name on a list or by calling and asking that their name be added to the non-unit overtime log book or list. *Id.* ¶ 37. The non-unit overtime log books or lists contain entries for everyday of the year and officers must sign-up for specific days they are willing work. *Id.*

It is undisputed that in the Medical and Security Units, as well as in other units throughout the NCCC, the names of all officers in a particular unit are placed on an overtime list in seniority order on January 1 each year. *Id.* ¶ 33. From that point forward, however, the list is tabulated by the number of hours offered, with the officer with the lowest number of hours on the top of the list, and the officer with the highest number of hours on the bottom. *Id.* The overtime lists are updated every day. *Id.* ¶ 34. In addition, in order to distribute overtime as evenly as possible, regardless of whether the officer whose name is highest on the list accepts or declines the overtime offered, those hours are attributed to his or her account and added to his or her total. *Id.* Anyone in a given unit can track how the overtime list was tabulated and bring any questions about those tabulations to their supervisor. *Id.* There is also no guaranty that overtime will be available on any particular day. *Id.* ¶ 35. Needless to say, in order to actually earn overtime pay

for a particular day, an officer must accept it when his or her name comes up on this list.  *Id.*  In other words, if an officer declines overtime when it is offered, he or she will not earn overtime pay.  *Id.*

In 2013, Saunders earned $67,304.80 in overtime pay, more than any other officer who worked at the NCCC.  *Id.* ¶ 25.  Consistent with overtime rules, Saunders' placement as the top overtime earner in the NCCC could be taken into account in assigning future overtime.  In 2014, Saunders was the fifty-seventh highest overtime earner among the over 800 corrections officers, earning $38,844.10.  *Id.* ¶ 26.  In 2015, Saunders dropped eleven spots to the sixty-eighth highest overtime earner, earning $26,871.27.  *Id.* ¶ 27.  Saunders who in 2014 through July 2015 was assigned to the Medical Unit asserts that although she regularly applied for overtime with the Visiting and Security units her overtime pay dropped during this period as a direct result of her having complained about Lima and filing her August 2103 memo.  *Id.*  ¶ 26-27,  Pl. Rule 56.1 Counter-Stmt. ¶ 26.  The defendants counter this assertion noting that the Visiting Unit overtime log books for 2014 reveals that Saunders never signed up for overtime and only signed up for overtime on eleven days in July 2015.[6]  *Id.* ¶ 42.  Saunders counters there are other ways corrections officers can be added to the overtime list other than physically signing the log books.  Pl. Counter-Stmt. ¶ 42.  Saunders admit, however, that there are a multitude of reasons why overtime can fluctuate from year to year including fluctuations in the amount of money spent by the County on overtime.  Defs. Rule 56.1 Stmt. ¶ 45.  In addition, the number of officers working, various management initiatives and whether an officer has taken leave can also cause fluctuations in overtime.[7]  *Id*. ¶¶ 49-51.  Saunders also acknowledges that overtime in the

---

[6] Neither party has clarified in which units Saunders earned her overtime, but it can be inferred that in addition to Medical and Security, she sometimes worked in the Visiting Unit.  Defs. Rule 56.1 Stmt. ¶ 39; Pl. Rule 56.1 Counter-Stmt. ¶ 39.

[7] Saunders took 35 days of leave in 2013, 85 days of leave in 2014 and 59.75 days of leave in 2015.  *Id.* ¶ 52.

Visiting Unit was at a five-year low in 2015.  *Id.* ¶ 43.

Indeed, by 2016, Saunders was once again a top overtime earner, earning $61,106.70, and in 2017, Saunders was the highest overtime earner amongst of all corrections officers, earning $129,953.47.  *Id.* ¶¶ 28-9.  In fact, according to the records submitted by the defendants, between 2014 and 2016, Saunders was paid more in overtime than Sokenis, who retired December 2015, O'Malley, Rogers, who also retired in December 2015, and several other officers.  Grunwald Decl. ¶ 54.  Saunders notes that she makes a higher rate of pay than other correction officers, and thus, her overtime earnings are higher than some officers who worked more hours but made less per hour.  Pl. Rule 56.1 Counter-Stmt. ¶ 56.

### F.    The EEO Complaint

On June 30, 2015, more than two years after she had first complained about Lima's conduct and four months after she had asked the union to investigate the alleged overtime issue, Saunders then submitted a written EEO complaint, in which she complained that she was being discriminated against because she is a black female.  Estes Decl. Ex. 50.  The body of the complaint describes a series of incidents dating back to 2014.  *Id.*

### 1.    *The Christmas Eve 2014 Incident*

Saunders begins her narrative by describing an incident that occurred on Christmas Eve 2014:

> On December 24, 2014, I was verbally abused by Correction Officer Robert Dwyer (WHITE)[.]  I immediately told him to stop.  He refused.  Dwyer had established a pattern and practice of speaking to Black women in this manner. I proceeded to Sgt. Sokenis (white) office.  I saw Dwyer was already there discussing the incident.  Adrian Campodonges who is a Union Representative (He is white) was present as well.  I tried to tell Sgt. Sokenis what actually occurred he began yelling at me and immediately took Dwyer['s] story as <u>truth</u> and disregarded everything I said.

Estes Decl. Ex. 50.  In an attachment to the EEO complaint, Saunders further explains

that:

> On December 24, 2014[,] 1 was verbally abused by Correction Officer Robert Dwyer(white) after having Jeffrey Campbell (black) cover my post for a short period of time. This is common practice throughout the Correctional Facility.[8] I immediately told Dwyer to stop harassing me but his behavior did not stop.
>
> *                    *                    *
>
> Often when I confront Sokenis with an incident between myself and fellow officers whom are white he is dismissive towards my complaints. I am reprimanded and the white officers are not.
>
> On December 30, 2014[,] Sokenis called me into his office to discuss the events of 12/24/14. Sokenis yelled. "Saunders you had a mental breakdown and needed a referral to Employee Assistance Program. Dwyer was not given a referral nor was he reprimanded for his role in the events that day. The white[] Correction Officers in the unit are given permanent posts while Black officers are not afforded the same benefits.
>
> For example[,] I asked Lt. O'Malley if I could be put on permanent post, he falsely informed me no officers have permanent post[s].  Instead he would float me throughout medical.
>
> January 6, 2015[,] I filed an Inter-Departmental Memo to Sokenis regarding [the] December 24, 2014 Incident in regard to the verbal abuse, aggressive behavior, retaliation and harassment.

*Id.*

The parties have both provided additional details concerning the December 24, 2014 incident in their submissions.  As the EEO Complaint suggests, Saunders was working in the Medical Unit and left the building without getting approval to do so from her supervisor.  Defs. Rule 56.1 Stmt. ¶ 82.  At the time, a nurse in the unit needed an escort to treat an inmate but no corrections officer was available.  *Id.* ¶ 82.  Accordingly, when Saunders returned to the Medical Unit she was "berated" by Dwyer.  *Id*. ¶ 84; Pl.

---

[8] In her memorandum, Saunders provides additional details concerning the December 24, 2014 incident.  She says she had to leave her post for a short period as her brother-in-law had died and she was assisting with making his arrangements.  Pl. Mem. at 5.

Rule 56.1 Counter-Stmt. ¶ 84.  After the incident, Saunders went to Sokenis' office. Defs. Rule 56.1 Stmt. ¶ 84.   According to Saunders, Dwyer was already there and reported that she flipped a desk over on him.[9] Pl. Rule 56.1 Counter-Stmt. ¶ 85.   A few days after the meeting, Sokenis suggested that Saunders seek assistance from the Employee Assistance Program ("EAP") after she had apparently stated, "you don't know what I'm going through." Defs. Rule 56.1 Stmt. ¶ 86.  Although Saunders does not dispute saying those words to Sokenis, she takes issue with the fact that Dwyer was not referred to EAP for the same incident.  Pl. Rule 56.1 Counter-Stmt. ¶ 86.  She also views the referral to EAP as a form of discipline because her firearm could have been taken away.  Pl. Rule 56.1 Counter-Stmt. ¶¶ 89, 92.  The defendants counter that the EAP program is voluntary and not disciplinary in nature.  *Id.* ¶ 92.

Moreover, in connection with this motion, Saunders has clarified that the January 6, 2015 inter-departmental memo, to which she refers in the EEO Complaint, was an addendum to a report she had submitted on January 5, 2015.  Pl. Mem. at 5; Estes Decl. Ex. 34.  In that memo, Saunders complained about Sokenis' attempts to refer her to EAP when, for example, he hadn't referred one officer who had been intoxicated and another officer who had a fight with a fellow corrections officer.  Defs. Rule 56.1 Stmt. ¶ 96.  The parties also explain that upon receipt of her January 5 Memo, Rogers ordered O'Malley to have Saunders expand on her allegations.[10]  *Id.* ¶ 97.  In addition, Rogers directed O'Malley to "keep the officers involved in th[e] incident separate" and advised that "Sokenis should have minimal contact with witnesses present when dealing with

---

[9] Saunders says that the Sheriff's Department's Internal Affairs investigated Dwyer's allegations and found them all to be "Not Sustained." *Id.*

[10] The January 9, 2015 follow-up memo addresses the Christmas Eve incident and complains of harassment and retaliation.  Estes Decl. Ex. 46.

Saunders." *Id.* ¶ 106. The following day, O'Malley informed Rogers that the directive to keep the officers separate was making it difficult to find suitable post assignments for both Saunders and Dwyer. *Id.* ¶ 108.

>   2.   *The February 5, 2015 Overtime Request*

The EEO Complaint also describes an incident that occurred on February 5, 2015. According to Saunders, she was deprived of the opportunity to earn overtime that day because of the directive from Rogers to keep the officers involved in the Christmas Eve incident separate. Defs. Rule 56.1 Stmt. at ¶¶ 109, 111. Specifically, Saunders states:

> February 5, 2015[,] [a]ccording to overtime list I was number one to be hired. Sgt. Sokenis stated my hours [were] given to Correction Officer Lane. My hours where given to Lane again on 2/18/15 by Corporal Gavigan. I am denied overtime in favor of white officers.
>
> There have been numerous conversations by officers regarding trying to get me removed from unit.
>
> For example, Dwyer, Johnson and Pisano (all white) discussed openly regarding trying to get Saunders removed from unit just like Correction Officer Mary Williams (black).
>
> February 20, 2015[,] I filed an lnter-Departmental Memo to Correction Officer Cory Timo Union Representative. Described the above incidents I faced in the Medical Unit. To this dated I have not heard anything regarding my complaints.
>
> I however been informed currently Dwyer has been rewarded and given third alternated as Desk Personal Assistance to Lt O'Malley, Sgt. Sokenis and Cpl. Gavigan. This gives him full access to the dally running of the unit including memos generated by administration my personal file as well etc.

Estes Decl. Ex. 50. According to Sokenis, on February 5, 2015, there were two overtime posts available: one was for 3.5 hours in the Core Building, and the other spot was 2.75 hours in the 832 Building. Defs. Rule 56.1 Stmt. ¶ 109. Saunders was at the top of the overtime list and had requested the 3.5 hour post; however, Sokenis assigned

her the 2.75 hour post in the 832 Building.  *Id.*  Sokenis says he did so to comply with

Roger's directive because both he and Dwyer were already working in the Core

Building.  *Id.*  As a result,  Saunders was given a half an hour less overtime.[11] *Id.*

     *3.     The June 23, 2015 Incident*

The EEO Complaint also references an incident that occurred four months later

on June 23, 2015.  To this end, Saunders complains:

> June 23, 2015[,] I was assigned a hospital run on overtime with C/O Lane and C/O Gunther was told to report for hospital with an Inmate run after having a meal break between 1600-1700 hours. Upon signing out a weapon at Core Desk at 1700 hours I head[ed] to the Transportation yard. I called Sgt. Sokenis to let him know I was in the yard. He said remain downstairs.
>
> Since Lane and Gunther did not come down right away[,] I went to the bathroom in D-Operations. This is the area where inmates enter and exit the Correctional Facility. I immediately called the medical unit to see if the officers left. I was told yes, however the officers were apparently delayed. I decided to check the inmates housing area. C/O Johnson passed me in the Operation entrance/exit door.
>
> While entering the D2D infirmary where inmate was house[d,] Sgt. O'Gara approached me. We began to converse when suddenly Sgt. Sokenis appeared and began shoutimg at me as to where I had been. I attempted to explain he continued shouting and walked away without further directives.
>
> I [sought] a ride to the hospital from Correction Officer Brooks whom informed me Lane, Gunther and Johnson had taken out the run. I immediately called Sokenis who stated[,] "If I was in the transportation yard I wouldn't have missed them." He never told me Johnson was reassigned to the hospital run and Johnson did not either as Johnson saw me before I decided to check on Lane['s] and Gunther['s] whereabouts.
>
> At approximately 2145 hours Sokenis wanted a report as to where I had been.
>
> On 6/24/15 I told Sgt. Sokenis I needed to speak to my union and attorney.  He said that would be fine.
>
> I was told to go to [meet]. As I headed to [meet] Cpl. Gavigan told me per Captain Ronald Rogers (white) I am to return to the medical transportation

---

[11] Saunders claims the Affirmative Action Officer assigned to this complaint found that "she was missing . . . maybe an hour or 45 minutes" of overtime, relating to this issue.  Estes Decl. Ex. 14; 63:15-63:20.

office and write my report. In fact the Captain informed me through Cpl. Gavigan I could only type it there. It is common practice to prepare your report with others to check for errors. I have limited knowledge with the use of the computer. I was pressured by Capt. Rogers to hand it in with errors.

Once finished Capt. Rogers removed me from the unit without a reason as to why he was doing so. As per department policy a two week notice is to be given when an officer is reassigned and it should never be used for punishment.[12]

C/O Lane and C/O Gunther [were] not punished for their role in the incident that day as the both of them where delayed at least 20 minutes before coming down to the transportation yard. . ..

Estes Decl. Ex. 50.[13]  According to Sokenis, following the incident, he sent an inter-departmental memo to Rogers regarding Saunders's abandonment of her post and indicated that her lack of accountability was causing problems in his ability to supervise the Medical Unit.  Defs. Rule 56.1 Stmt. ¶¶123-24.  Rogers recommended that she be reassigned to the Security Unit.  *Id*. ¶ 125.  Saunders was moved to Security Unit effective June 25, 2015, which the defendants note is the very assignment she had requested earlier.  *Id.* ¶¶ 81, 127.  Saunders was also placed under corporal supervision. *Id*. ¶ 132.  However, on July 13, 2015, Saunders' reassignment order was amended so that she could work under the direct supervision of a sergeant for the purposes of overtime if a given area did not have a corporal assigned.  *Id.* ¶ 138.  Saunder's corporal supervision requirement was not lifted until March 23, 2017.  *Id.* ¶ 139.

### G.    Osterman's Review of the EEO Complaint

Upon receipt of the EEO complaint, Guilty forwarded a copy to Osterman.  Pl. Rule 56.1

---

[12] Saunders explains in her memorandum that being placed under "corporal supervision," means you cannot work unless you are under the direct supervision of a corporal.  Defs. Rule 56.1 Stmt. at ¶¶ 132-33.  As a result of being placed under corporal supervision, an officer may lose overtime opportunities because they cannot be assigned to a post if there is no supervising corporal on duty.  *Id.* at ¶ 133.  In addition, being removed from one unit and assigned to another influences the overtime available to an officer.

[13] Saunders' overtime shift ended early on the day of the incident because there were extra straight time corrections officers available when she returned from the hospital run.  Defs. Rule 56.1 Stmt. ¶ 120.

Counter-Stmt. ¶ 15.  Osterman, Antonio Patino and Guilty, then reviewed the complaint to determine if Saunders had experienced adverse employment actions on the basis of protected classifications.  Defs. Rule 56.1 Stmt. ¶ 18.  According to Osterman, upon the receipt of any complaint of discrimination, EEO representatives, Affirmative Action Officers and Ostermann would first review a complaint to determine if it was a formal complaint, limited inquiry or a matter not appropriate for further review.  *Id.* ¶ 16.  Osterman explained at her deposition that a complaint is not appropriate for further EEO review if it does not implicate protected classifications and if there is no adverse employment action.  *Id.*  With limited inquiries, the EEO Office tries to determine if there has been an adverse employment action and if there was a protected classification at issue.  *Id.* ¶ 17.  If both items are established, a limited inquiry becomes an investigation and an investigation number is assigned.  *Id.*

Ostermann further testified that as part of the limited inquiry into Saunder's complaint, Patino and Guilty reviewed documents, conducted an interview of Saunders and reported to her during their investigation.  *Id.* ¶ 19.  The EEO Office concluded that Saunders complaint did not implicate any violations or department policies.  Defs. Rule 56.1 Stmt. ¶ 21.  Saunders complains that an adequate investigation was never done.  Pl. Rule 56.1 Counter-Stmt. ¶ 18.  Among other things, Saunders claims that the EEO Office should have interviewed all the witnesses in her complaint and looked into why she was being denied overtime.  Pl. Mem. at 10.

### H.    Additional Racist Comments

Finally, while Saunders did not specifically reference the Lima incident or the racial comments that were being made to inmates and officers in her EEO complaint, Saunders now argues that she found those comments to be offensive.  Saunders Aff. ¶ 47.  Specifically, Saunders asserts that white officers regularly referred to black inmates as "skids" and "mutts."

16

*Id.* ¶¶ 30-9; Estes Decl. Ex. 1; 300:23-301:10.  Saunders also claims that in addition to regularly using racial epithets directed at blacks, white corrections officers commonly made racist and offensive comments about the hair of black officers.  *Id.* ¶ 45; Estes Decl. Ex. 1; 265:2-266:7.  For example, Saunders claims that she was told about an incident in 2014-15 in which a white corrections officer had referred to Cpl. Miriam Robinson's hair as "nappy, smelly dreadlocks." *Id.* at ¶ 44; Estes Decl. Ex. 1; 265:2-266:7.  Saunders now claims that whenever she is in a unit that contained black inmates and was working with white officers, she would hear these terms at least once per week.  Saunders Aff. at ¶ 45.

**I.      The Parties' Contentions**

Saunders asserts that she has been subjected to race discrimination, retaliation and a hostile work environment.  To this end, she contends that she has suffered from a variety of adverse employment actions, including being denied a permanent post, overtime and a competent investigation into her claims of discrimination and retaliation.  Saunders further claims that both her involuntary removal from the Medical Unit and her placement under corporal supervision amounted to adverse employment actions.

The defendants contend that Saunders believes that discrimination is lurking behind every personnel action but her claims are unsustainable.  First, they argue that Saunders cannot prove that she suffered an adverse employment action or that any such action occurred under circumstances that would give rise to an inference of discriminatory intent.  Second, they argue that they had a legitimate, nondiscriminatory reason for all of their actions.  With respect to Saunders' hostile work environment claim, the defendants contend that Saunders has failed to present any evidence to suggest that she was subjected to conduct that was sufficiently severe or pervasive to create an environment that would reasonably be perceived as hostile or abusive.

Finally, the defendants assert that Saunders' retaliation claim must also be dismissed because the personnel actions taken against her were consistent with NCCC's procedures and not racially motivated.

## DISCUSSION

### A.     Standards of Law

#### 1.     Summary Judgment

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a

particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322).  A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case.

However, "[t]he Second Circuit has 'explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication.'" *Greenberg v. State Univ. Hosp.-Downstate Med. Ctr.*, No. 15 CV 2343 PKC VMS, 2019 WL 4752018, at *13 (E.D.N.Y. Sept. 29, 2019)(citing *Thompson v. Kaufman's Bakery, Inc.,* No. 03-CV-340 (WMS), 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005)).  Nevertheless, "summary judgment remains appropriate in discrimination cases, as 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation.'" *Singh v. New York State Dep't of Taxation & Fin*., 911 F. Supp. 2d 223, 233 (W.D.N.Y. 2012) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

    2.    *Differences Between Claims of Discrimination under §1983 and Title VII*

As previously stated, Saunders has asserted claims under Title VII of the Civil Rights Act of 1964, the NYSHRL and the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983.  Title VII prohibits employers from discriminating against an individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "'To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that '(1) [s]he is a member of a

protected class; (2) [s]he was qualified for the position he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.'" *Mercedes v. AVA Pork Prod., Inc*., No. 13-CV-3212 JFB AKT, 2014 WL 1369611, at *5 (E.D.N.Y. Apr. 8, 2014) (citing *Chang v. N.Y.C. Dep't for the Aging*, No. 11 Civ. 7062(PAC) (JLC), 2012 WL 1188427, at *4 (S.D.N.Y. Apr. 10, 2012). "New York courts require the same standard of proof for claims brought under the NYHRL as those brought under Title VII, and thus, claims under the NYHRL and under Title VII are essentially identical." *Allen v. Advanced Digital Info. Corp*., 500 F. Supp. 2d 93, 104 (N.D.N.Y. 2007) (citing *Brown v. County of Oneida*, 41 F. Supp. 2d 172, 180 (N.D.N.Y. 1999)).

42 U.S.C. § 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To establish a claim under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 317 (E.D.N.Y. 2014) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)). Where a plaintiff asserts a claim under the Fourteenth Amendment Equal Protection Clause,[14] that claim generally parallels the Title VII discrimination

---

[14] The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. 5.

claim once the color of law requirement has been met.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015).  Nonetheless, the Second Circuit has recently outlined several ways in which Title VII and § 1983 remain different and those differences warrant mention.

In *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019), the Second Circuit noted:

> First, and most obviously, a plaintiff advancing a claim pursuant to § 1983 must plausibly allege that 'the alleged deprivation was committed by a person acting under color of state law.' Title VII has no such requirement.  Second, unlike a Title VII claim, which may be brought only against the employing entity, a § 1983 claim 'can be brought against an[y] individual' responsible for the discrimination.  Third, while an employer may be liable under Title VII for any discriminatory conduct that can properly be attributed to the employer through agency principles, § 1983 does not permit such vicarious liability. 'If [an individual] defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant.'

934 F.3d at 212 (citations omitted).  The *Naumovski* Court also highlighted a fourth distinction between the statutes which it characterized as "crucial."  Specifically, the Second Circuit cautioned:

> the disparate treatment provision of Title VII is unusual in that it [generally] incorporates a 'lessened causation standard.' Under Title VII, a plaintiff may succeed simply by establishing that [a protected characteristic] was a 'motivating factor for any employment practice, even though other factors also motivated the practice.' Thus, even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII. In other words, an employer's insistence that he would have terminated the plaintiff anyway is no defense. . ..
>
> Not so § 1983. As the Supreme Court has explained, a 'standard requirement of any tort claim' is that plaintiff show 'that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct. . ..' It follows, therefore, that a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment.  It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct. Accordingly, a court considering a § 1983 claim at summary judgment must

determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for' [the] discrimination.

934 F.3d 200, 213–14.

Although the Court's must, therefore, be careful to account for the higher burden associated with § 1983 claims, the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) still applies. Under *McDonnell Douglas*, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, and, thus, (3) the burden shifts back to the plaintiff to show that the employer's reason is pretextual and that it masks the employer's true discriminatory reason.  *See Patterson v. City of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004).  While intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

**B.    Analysis**

*1.    Saunders' Affidavit and Rule 56.1 Counterstatement*

As a threshold matter, the Court must address the defendants' arguments concerning the facts raised in Saunders' affidavit and her alleged noncompliance with Local Rule 56.1.  First, it is true that "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine' issues for trial."  *See Hayes v. New York City Dep't of Corr.,* 84 F.3d

22

614, 619 (2d Cir. 1996).  However, the Court has examined Saunders' affidavit and her deposition transcript and does not find that the principle applies in this case.  The defendants contend that paragraphs 3-8, 12-22, 26, 29, 31-41 and 45-47 include allegations that are not in the complaint or the deposition.  This overstates the additions and inconsistencies.  For example, paragraphs 3-8 and 12 of Saunders' affidavit describe the "Lima incident."  While Saunders certainly has provided some additional details, she referenced the Lima incident at the very onset of her deposition.  Estes Decl. Ex. 1; 10:8-12:6.  She also listed Lima as an officer who called black inmates names.  *Id.* at 300:23-301:18.  Similarly, paragraphs 12-22 primarily refer to the fact that Grange was blackballing her with respect to overtime.  Saunders described Grange's alleged denial of overtime in detail at the deposition.  *Id.* at 267:13-268:24.  With respect to paragraphs 26 and 29, it is true that Saunders did not previously state that a white officer named Lane had received more overtime than she did, but Lane is referenced in the EEO complaint and the defendants were certainly on notice about the entire overtime.  Finally, paragraphs 31-41 and 45-47, primarily address "other derogatory comments" made by corrections officer.  Again, while Saunders has added some additional details, Saunders mentioned the fact that inmates were being referred to as "skids" at her deposition.  *Id.* 300:23-301:10.

Similarly, the Court has chosen to accept Saunders' Local Rule 56.1 Counterstatement. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules"). Local Rule 56.1(b) requires a party opposing a motion for summary judgment to submit a statement responding to each numbered paragraph in the movant's statement of facts, and if necessary, submitting additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried

(the "Counterstatement").  *See* Local Rule 56.1 (b).  The opposing party's Counterstatement must be followed by citation to evidence that would be admissible.  *See* Local Rule 56.1(d).  The defendants take issue with the fact that Saunders placed her counterstatement is the paragraphs following that her admissions or denials of their undisputed facts rather than placing them in separate paragraphs as the rule contemplates. They argue that she did so to spin the impact of her admissions.  The Court disagrees.  Saunders primarily admitted to the defendants' facts and the Court did not find her supplementation to distract from those admissions.  Accordingly, the Court turns to the merits of the plaintiff's claims.

2.    *Saunders' Race Discrimination Claim*[15]

The defendants do not dispute that Saunders has met the first to prongs necessary to establish a *prima facie* case of race discrimination, those being, she is a member of a protected class and she was qualified for the position.  They do, however, contend that with respect to her race discrimination claim none of the alleged personnel actions taken against Saunders resulted in a material change to the terms and conditions of her employment.  The undersigned agrees.

a.    Adverse Actions

Saunders contends that she was subject to multiple adverse employment actions due to her race.  Those action can be sorted into five main categories: (1) the denial of a permanent post; (2) the involuntary removal to the Security Unit; (3) the loss of overtime opportunities associated with the reassignment to the Security Unit; (3) the denial of a competent investigation into her claims of discrimination and retaliation; and (4) the placement under corporal supervision.  The Second Circuit has made clear that an "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v.*

---

[15] The parties address the Title VII, NYHRL and § 1983 claims together.  For the sake of clarity, the Court has done the same and will highlight the difference in standards where relevant.

*Potter*, 548 F.3d 70, 78 (2d Cir. 2008).  Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse,* 673 F.3d 141, 150 (2d Cir. 2012) (citing *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). "Examples of materially adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citations omitted).  With this guidance in mind, the Court addresses the conduct relied upon by Saunders in support of her race discrimination claim.

       i.     Denial of a Permanent Post

In her EEO Complaint, Saunders claims that the defendants assigned white corrections officers to permanent posts while black officers were not afforded the same benefits.  Indeed, Saunders alleges that she asked O'Malley if she could be put on permanent post and "he falsely informed [her that] no officers have permanent post[s]." Estes Decl. Ex. 50.  For a number of reasons, the alleged denial of a permanent post at the NCCC did not amount to an adverse action. To begin with, "[a]ssignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where [as here] . . . the rate of pay and benefits remains the same." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 213 (E.D.N.Y. 2014)(citing *Rodriguez v. Coca Cola Refreshments USA, Inc*., No. 12–CV–234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013)).  Indeed, changes in job assignments are only considered an adverse employment actions when they, for example, result in a change in responsibilities so significant as to constitute a setback to the plaintiff's career or result in a disproportionately heavy workload.  *Id.*

(citing *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013); *Lopez v. Flight Servs. & Sys., Inc.,* 881 F. Supp. 2d 431, 441 (W.D.N.Y. 2012)).

In this case, Saunders has offered no evidence to suggest that O'Malley's failure to provide her with a permanent or steady post had an impact on her job or responsibilities. Rather, it is undisputed that all posts involve the same demands of providing for the care, custody and control of inmates. Defs. Rule 56.1 Stmt. ¶ 75. In addition, a corrections officer's job assignment on a particular day has no bearing on the rate of pay earned by that officer. *Id.* ¶ 77. Moreover, Saunders acknowledges that the Sheriff's Department had discretion to assign the officers regardless of their seniority to any unit or post to meet the needs of the NCCC; that no officer could select his or her own assignment and that officers could be reassigned to any post, at any time, on any day, even in mid-shift, based on a unit's staffing needs. *Id.* ¶¶ 68-75. Accordingly, the denial of Saunders' request for a permanent or steady post does not amount to an adverse employment action.

ii.   Reassignment to the Security Unit and the Related Loss of Overtime Opportunities

Equally unavailing is Saunders' claim that being reassigned to the Security Unit was an adverse employment action. Saunders admits that the reassignment from the Medical Unit to the Security Unit did not alter any of her job responsibilities; nor did it not amount to a demotion or materially impact her work experience. *Id.* ¶ 66. In addition, the lateral transfer did not involve a change in her rate of pay or benefits. While the Supreme Court has recognized that "[a]lmost every job category involves some duties that are less desirable than others," *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 55, 126 S. Ct. 2405, 2407, 165 L. Ed. 2d 345 (2006), the only argument offered by Saunders with respect to the reassignment is that "some positions" require less interaction with inmates. Pl. Rule 56.1 Counter-Stmt. ¶ 75. However, she does not

26

appear to claim that the Medical Unit positions required officers to have less interaction with inmates.  Moreover, Saunders had previously requested to be reassigned to the Security Unit because she wanted to use her experience to assist younger officers.  Defs. Rule 56.1 Stmt. ¶ 81.

In relation to the reassignment, Saunders also argues that she suffered an adverse action because the reassignment caused her to be placed at the bottom of the Security Unit's overtime list.  *See* Saunders Aff. ¶ 29; Pl. Mem. at 13.  As a result, she claims to have lost out on overtime opportunities in 2015.[16]  Defs. Rule 56.1 Stmt. ¶ 27.  While the deprivation of overtime pay may be considered materially adverse, *see Bowen-Hooks*, 13 F. Supp. 3d at 217-18, the Second Circuit has held that the loss of overtime resulting from a properly enforced disciplinary policy does not amount to an adverse action.  *See Brown*, 673 F.3d at 150.  Specifically, in *Brown*, the Second Circuit held that because Brown's loss of overtime pay was a direct result of his suspension, and not an additional action taken by his employer, the loss did not constitute an adverse employment action.  *Id.* at 151.  The Court noted that in cases such as these, "the relevant question . . . is "whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment."

Although Saunders' transfer to the Security Unit was not technically a form of discipline, the Court is guided by the principles set forth in *Brown*.  Saunders' transfer was certainly undertaken in response to her supervisor's complaint that she lacked accountability and that her actions were causing a problem in his ability to supervise the Medical Unit.  Defs. Rule 56.1 Stmt. ¶ 124.  Saunders' transfer to the Security Unit came on the heels of her having admittedly left her post in violation of NCCC Regulations.  *Id.* ¶¶ 125-26.  As such, the Court finds that any

---

[16] As discussed below, she also attributes the 2015 decrease to having been placed under corporal supervision and to being retaliated against for complaining about Lima and filing the August 2013 memo.

loss in overtime opportunities directly associated with the transfer to the Security Unit did not amount to an adverse action.

     iii.     Denial of an Adequate EEO Investigation

Saunders further contends that the defendants' failure to perform a reasonable investigation into her claims of discrimination and retaliation amounted to an adverse action. Pl. Mem. at 19. However, Saunders has not set forth any nonconclusory evidence to support this claim. As soon as Saunders filed her August 30, 2013 memo, O'Malley forwarded the informal complaint to the Affirmative Action Unit. Defs. Rule 56.1 Stmt. ¶¶ 9-10. 12. The matter was assigned to Guilty who contacted and meet with Saunders to review her claims. *Id.* ¶ 11. Although Saunders complains that she never heard anything else about that complaint, *see* Saunders Aff. ¶ 24, Saunders told Guilty that she did not want to file a formal complaint because she had no faith in the process. *Id.* ¶ 12; Pl. Rule 56.1 Counter-Stmt. ¶ 12.

With respect to the EEO Complaint, following regular protocol, Osterman, Antonio Patino and Guilty conducted a "limited inquiry" to determine if there had been an adverse employment action and if there was a protected classification at issue. Defs. Rule 56.1 Stmt. ¶ 17. Indeed, Ostermann testified at her deposition that upon the receipt of any complaint of discrimination, EEO representatives, Affirmative Action Officers and Ostermann would review the complaint and determine if it was a formal complaint, limited inquiry or a matter not appropriate for further EEO review. *Id.* ¶ 16. Osterman categorized Saunders' complaint as one appropriate for limited inquiry. Accordingly, she had Patino and Guilty review documents, conduct an interview of Saunders and report their findings to her. *Id.* ¶ 19. Although Saunders disagrees with their conclusion and asserts that Patino and Guilty should have spoken to more witnesses, Saunders has not presented any nonconclusory evidence that would permit a

28

reasonable jury to conclude that the defendants had failed to respond in a reasonable and adequate manner to her EEO complaint.  Accordingly, the manner in which her complaints were investigated did not give rise to an adverse employment action.

iv.    Corporal Supervision

Finally, in connection with her race discrimination claim, Saunders argues that she suffered an adverse employment action when she was placed on corporal supervision following the June 23, 2015 incident, when she could not be located to transport a prisoner.  Pl. Mem 13-4.  However, in this case, neither the placement under corporal supervision nor the alleged loss in overtime opportunities associated with that supervision amounted to a materially adverse action.  Indeed, it is important to note that Saunders does not dispute that pursuant to NCCC Regulations, she was not permitted to leave her post, but did so to assist with the making of arrangements for her brother-in-law's funeral.  Defs. Rule 56.1 Stmt. ¶¶ 82, 87, 126.  Moreover, with respect to the corporal supervision, even excessive monitoring has failed to meet the threshold for an adverse employment action absent evidence of a materially adverse impact.  *Dawson v. City of New York*, No. 09 CIV. 5348 PGG, 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19, 2013); *Hill v. Rayboy–Brauestein*, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) (micro-management was not adverse employment actions particularly where plaintiff's only evidence of disparate treatment was the plaintiff's own perception that she was treated differently).  To this end, Saunders' only claim that she was materially impacted by the supervision is that she lost overtime opportunities as a result of it.  Pl. Rule 56.1 Counter-Stmt. ¶¶133, 138.  However, nothing in the record supports the conclusion that her placement under corporal supervision materially impacted her ability to earn overtime in 2015.  In fact, it is undisputed that, on July 13, 2015, nineteen days after she had been placed under corporal supervision, her supervision assignment was amended so that she

could work under the direct supervision of a sergeant for the purposes of overtime if a given area did not have corporal assigned.  Defs. Rule 56.1 Stmt. ¶ 138.  Saunders has offered no evidence to suggest that she actually lost overtime opportunities in the nineteen days prior to that amendment.

Moreover, following the reassignment to the Security Unit and her placement under corporal supervision, Saunders overtime actually increased.  Indeed, as previously noted, prior to her placement under corporal supervision, Saunders was the sixty-eighth highest overtime earner of all corrections officers at the NCCC.  *Id.* ¶ 27.  In 2016, a full year following the reassignment and placement under corporal supervision, Saunders was the sixteenth highest overtime earner and, in 2017, she was the highest.  *Id.* ¶¶ 28-9.  In sum, the Court finds that none of the actions relied upon by Saunders in support of her race discrimination claim amount to a materially adverse change in the terms and conditions of her employment.[17]

b.    Inference of Discrimination

Because Saunders cannot show that she experienced an adverse employment action in connection to her *prima facie* case of race discrimination, the Court need not address the parties' arguments concerning causation or the balance of the *McDonnell Douglas* analysis. Nonetheless, it warrants mention there is an absence of direct evidence of discriminatory intent in this record.  Saunders' race discrimination case primarily rests on the possibility that a jury could find that similarly situated white corrections officers would not have been investigated for leaving their post or reassigned to a different unit.  To this end, Saunders' allegations are entirely conclusory.  For example, Saunders argues that the only other officer to be removed from the

---

[17] The defendants have dedicated a portion of their brief to Saunders' argument that the referral to EAP was an adverse action.  Saunders has not addressed this argument in her memorandum in opposition to the motion, and thus, the Court assumes that the contention has been abandoned.

Medical Unit and placed under corporal supervision was another black employee. *Id.* ¶¶ 127, 132. Even accepting that fact as true, there is no indication that the other employee's reassignment was motivated by discrimination. Moreover, Saunders complains, without support, that white officers are not forced to hear white inmates called slurs. While Saunders has certainly listed some offensive comments used by corrections officers in connection with black inmates, those comments are not linked in any way to alleged adverse actions. Accordingly, the Court respectfully reports and recommends that Saunders' Title VII, NYSHRL and § 1983 race discrimination claims be dismissed.

       3.      *Saunders' Retaliation Claim*

      Saunders also claims she has been retaliated against for engaging in a protected activity. Title VII prohibits retaliation by providing that it is unlawful "for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by" Title VII or "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "To make out a *prima facie* claim of retaliation [under Title VII], a plaintiff must make an initial showing of (1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwan v. Andalex Grp.* LLC, 737 F.3d 834, 844 (2d Cir. 2013). Similarly, under § 1983, a plaintiff can establish a retaliation claim by showing that: "(1) defendants acted under the color of state law, (2) [and] took adverse employment action against [her], (3) because [s]he complained of or otherwise opposed discrimination." *Vega*, 801 F.3d at 91.

In 2013, the Supreme Court clarified that Title VII retaliation claims, like § 1983 claims, "'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)(*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013)).  It is important to note, however, that "'[b]ut-for' causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 90–91 (quoting *Zann*, 737 F.3d at 846).  Finally, under either statute, a retaliatory purpose can be shown indirectly by timing, that is, protected activity followed closely in time by adverse employment action.  *Id.*  With this framework in mind, the Court turns to Saunders' retaliation claim.

a.    Protected Activities and the Defendants' Awareness of those Activities

Saunders contends that the defendants retaliated against her for (1) complaining internally to Sgt. Nicholas about Lima's treatment of the black inmates; (2) telling Lt. Vera Fludd about the incident with Lima and his aggression toward black inmates; (3) complaining to O'Malley and Skaee that Grange was calling her a "rat" and an "inmate lover," and preventing her from getting overtime in the Security Unit; (4) telling O'Malley and Skaee that Lima had a habit of beating up black inmates; (5) telling Miller of Internal Affairs that Lima had a habit of being aggressive with black inmates and that she was called a "rat" and an "inmate lover" for reporting him; (6) telling Sgt. Lewis that Grange was not hiring her for overtime and was calling her a "rat" and an "inmate lover" due to her complaints; (7) submitting the August 30, 2013 memo to her Sergeant, in which she complained that she had been the target of harassment and

discrimination in this department; (8) submitting the January 5, 2015 Inter-Departmental Memo to her Sergeant complaining about harassment and retaliation; (9) submitting the June 24, 2015 Inter-Departmental Memo complaining about harassment; and (10) submitting the June 30, 2015 complaint of discrimination and retaliation to the Nassau County Affirmative Action Office. Pl. Mem. at 17. She further argues that each of the above complaints was made to one of her superior officers. *Id.* at 18.

Under Title VII, protected activity includes both opposing discrimination and participating in Title VII proceedings. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Notably, the conduct does not have to be actually prohibited by Title VII, as long as a plaintiff has a "good faith belief" that such conduct violated the law. *See La Grande v. DeCrescente Distrib. Co.*, 370 Fed. Appx. 206, 212 (2d Cir. 2010). For example, in this case, while the initial complaints Saunders made about Lima did not involve discriminatory employment practices, Saunders appears to have believed that she was complaining about unlawful conduct to her employer. *Id.* (citing *Manigaulte v. C.W. Post of Long Island Univ.*, 659 F. Supp. 2d 367, 374–75 (E.D.N.Y. 2009) (permitting a non-disabled professor who complained of discrimination against disabled students to assert a claim for retaliation). More importantly, Saunders filed several memoranda and at least one formal complaint stating that she was the subject of discrimination, harassment and retaliation. The Court finds that these constitute protected activities.

Nevertheless, as previously noted, the defendants take issue with the alleged protected activities, in part, because they include "new" allegations. In addition, with respect to Saunders' reliance on the memoranda and written complaint, which are not new allegations, the defendants debate the accuracy of her claims. However, in neither case do they dispute knowledge of those

33

protected activities. Rather, they argue that Saunders did not suffer an adverse action with respect to her retaliation claim and, even if she had, there is no causal connection between her complaints and the personnel actions taken against her. Accordingly, given the Court determination that the activities were protected, the Court turns to the defendants' arguments concerning the alleged adverse actions.

b.      Adverse Actions

Saunders relies on many of the same personnel actions that she relied upon in connection with her race discrimination claim. Specifically, in connection with the retaliation claim, Saunders, once again, asserts that she lost overtime opportunities resulting from her placement under corporal supervision; she was involuntarily reassigned to the Security Unit and that the defendants' failed to perform a reasonable investigation into her claims of discrimination and retaliation. For the same reasons previously stated, the Court finds that those actions do not amount to materially adverse actions.

In addition, Saunders claims that her overtime plummeted in 2014-15 after she had filed her discrimination complaints in August 2013, June 2015 and had informally complained to her supervisors about Lima's conduct and Grange's refusal to give her overtime. Pls. Mem. at 5. In support of this claim, Saunders notes that she was the twenty-first highest overtime earner of all corrections officers at the NCCC in 2012. Defs. 56.1 Stmt. ¶ 12. In 2013, Saunders was the highest overtime earner of all corrections officers at the NCCC. *Id.* ¶ 13. In 2014, after she complained to her supervisors about Lima's treatment of inmates, Grange's refusal to give her overtime and had filed a complaint indicating that she had "been the target of harassment and discrimination in [the] department. . ..," her overtime compensation dropped by almost half. See

*Id.* ¶ 14; Estes Decl. Ex. 7.  Similarly, in 2015, Saunders dropped eleven spots to the sixty-eighth

highest overtime earner, earning $26,871.27.  *Id.* ¶ 27

While it is well-settled that "[a] deprivation of the opportunity to earn overtime can be

considered a materially adverse employment action," *Bowen-Hooks*, 13 F. Supp. 3d at 217-18

(citing *Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y.2012), Saunders has

failed to present facts upon which a reasonable juror could conclude that that her opportunities to

earn overtime were materially impacted after she launched the above-referenced complaints.  To

begin with, the defendants have offered numerous reasons why a corrections officers' overtime

pay would have fluctuated during that time period, including: (1) the procedures for distributing

overtime evenly by placing the officer with the lowest number of hours on the top of the list with

top earners dropping down; (2) the officers' decision not to accept the overtime assignment; (3)

fluctuations in the amount of money spent by the County on overtime at the NCCC; (4) the total

number of corrections officers working at the NCCC at a given time; (5) the existence of

management initiative; and (6) whether the officer is on leave.   Defs. 56.1 Stmt. ¶ 34, 38, 45, 48,

50 51.  Even considering Saunders counter argument that "discrimination can also impact

overtime," the undisputed evidence reveals that Saunders' own conduct was the likely cause of

the drop in her overtime compensation.

Notably, Saunders claims to have applied for and been denied overtime in the Visiting

and Security Units in 2014 and 2015.  However, it is undisputed that she never signed up for

overtime in the Visiting Unit in 2014 a year in which she was absent 85 days on leave.  In 2015

she only signed up on eleven days.  Defs. 56.1 Stmt. ¶ ¶ 42; Berry Decl. ¶¶ 7-8.  Moreover, to the

extent Saunders contends that Grange would not give her overtime in the Security Unit because

he deemed her to be a "rat," the records produced by the defendants establish that, even if true,

Grange's conduct could not have materially altered the terms and conditions of her employment. The defendants have provided the Court with a chart of the total overtime expenses incurred at the NCCC from 2011 to 2018. Estes Decl. Ex. 29. The chart reveals that the total overtime expense for the Security Unit was a mere $3,419.36 in 2014 and $2,349.01 in 2015. *Id.* This compares to the overtime expenses incurred, for example, by the Visiting Unit of $710,343.13 in 2014 and $503,622.78 in 2015. *Id.* Accordingly, Saunders' "significant" drop in overtime pay in 2014 and 2015 could not possibly have been attributed to the failure to earn overtime in the Security Unit.

In addition, the chart confirms the defendants' claim that overtime expense had dropped in the Visiting Unit and was at a five-year low in 2015. Grunwald Decl. ¶¶ 91, 93. In contrast, the records show that when overtime spending increased in 2016, so did Saunders' overtime earnings causing her to surge to the 16th highest overtime earner in the department. *Id* ¶ 48. Indeed, as overtime continued to increase to an even larger year- to-year amount in 2017, Saunders became the highest overtime earner that year. *Id* ¶ 49. For these reasons, the Court finds that the actions relied upon by Saunders in support of her retaliation claim do amount to a materially adverse employment action and respectfully recommends that her Title VII, NYSHRL and § 1983 retaliation claims be dismissed.

### 4. Saunder's Hostile Work Environment Claim

Finally, Saunders claims that "the racial animus exhibited by employees at [NCCC] was both severe and pervasive enough to be hostile or abusive." Pl. Mem. at 24. She says, in this regard, that she "heard, on an almost a daily basis, white officers refer to black inmates as "skids," and on a weekly basis refer to them as "mutts." *Id.* She also claims that Lima, on more than one occasion, called black inmates "nigger." *Id.* She now complains that the misconduct

36

was never properly addressed.  As such, Saunders contends that the defendants' repeated refusal to take remedial action created a hostile work environment.

"'In general, to prevail on a hostile work environment claim, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Thompson v. Spota*, No. CV 14 2473 JMA AKT, 2018 WL 6163301, at *32 (E.D.N.Y. Aug. 23, 2018), report and recommendation adopted, No. 14 CV 2473 JMA AKT, 2018 WL 4771901 (E.D.N.Y. Sept. 30, 2018), reconsideration denied, No. 14-CV-2473, 2019 WL 2602062 (E.D.N.Y. June 25, 2019)(citing *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2,* 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011)).  Moreover, "a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his or her] working environment."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  There is, however, no requirement that the plaintiff plead an adverse employment action because the creation of the hostile work environment in and of itself is deemed to have changed the conditions of his or her employment resulting in an adverse employment action.  See, e.g., *White v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1376 (CM), 2014 U.S. Dist. LEXIS 45419, 2014 WL 1273770, at *16 (S.D.N.Y. Mar. 28, 2014).

In this case, Saunders has not adequately alleged the existence of a hostile work environment.  In support of her claim, Saunders relies entirely on three categories of comments – Lima's use of the term "nigger" with respect to inmates, white officers use of the terms "skid" and "mutt" with respect to inmates and comments about the hair of both inmates and black officers.  Specifically, Saunders contends that several black inmates had complained about Lima

calling them "niggers" and exhibiting aggressive behavior toward them.  Saunders also asserts

that white officers regularly referred to black inmates as "skids"  and "mutts."  Pl. Mem. at 24.

Finally, Saunders claims that in addition to regularly using racial epithets directed at blacks,

white corrections officers commonly made racist and offensive comments about the hair of black

inmates and officers.  *Id.* at 11.  For example, Saunders asserts that she was told about an

incident in 2014-15 in which a white corrections officer had referred to Cpl. Miriam Robinson's

hair as "nappy, smelly dreadlocks." *Id.*  While the language described by Saunders'

memorandum is offensive, she has failed to raise a genuine issue of fact that she suffered an

objectively hostile work environment on the basis of her race.  The small number of events that

Saunders describes, with little evidentiary support, were neither severe nor pervasive and did not

materially alter her day-to-day working conditions.  Indeed, the standard for a hostile work

environment claim is demanding – a plaintiff must prove that the conduct was so "'offensive,

pervasive, and continuous' to amount to a constructive discharge." *De La Rosa v. City of N. Y.*

*Police Dept.*, No. 09 Civ. 5290 (SAS), 2010 WL 4177626, at *1 (S.D.N.Y. Oct. 22, 2010), *aff'd*,

461 F. App'x 73 (2d Cir. 2012).  Relevant factors include: "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*

*v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  Here, Saunders

has simply identified a handful of instances where offensive language was used with respect to

inmates and other officers.  But none of these comments amount to a constructive discharge or

rise to the level of severity required to state a claim for hostile work environment.  Accordingly,

the Court recommends that the defendants' motion for summary judgment with respect to

Saunders' hostile work environment claim also be granted.

**OBJECTIONS**

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the Court via ECF.  Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


Dated: Central Islip, New York
       February 18, 2020

                          _____/s_____
                          ARLENE R. LINDSAY
                          United States Magistrate Judge